# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ALAN LAMOTHE, an individual,

        *Plaintiff,*

v.

DECENTRAL LIFE, INC, F/K/A SOCIAL LIFE NETWORK, INC,
a Nevada corporation;
MJLINK.COM, INC., a Delaware corporation;
HUNTPOST.COM, INC., a Colorado corporation;
LIKERE.COM, INC., a Colorado corporation;
KEN TAPP, an individual; and
GREGORY TODD MARKEY, an individual.

        *Defendants.*

---

## COMPLAINT

---

Plaintiff, Alan Lamothe ("Plaintiff"), by and through his undersigned attorneys, submits the following Complaint against Decentral Life, Inc. f/k/a Social Life Network, Inc. ("Decentral"), MjLink.com ("MjLink"), Huntpost.com, Inc., LikeRE.com, Inc. ("Corporate Defendants"), Ken Tapp, and Gregory Todd Markey ("Director Defendants") (together, referred to herein as "Defendants").

## PARTIES

1.     Plaintiff, Alan Lamothe, is an individual who is a resident of the state of New York.

2.     Defendant Decentral Life, Inc. f/k/a Social Life Network, Inc. is a Nevada corporation with its principal place of business in Colorado. Decentral is a publicly traded company on the OTC Markets, which provides social networking and e-commerce platforms using blockchain and AI technology to assist startup founders and niche industry communities.

3.     Defendant MjLink.com, Inc. is a Delaware corporation, incorporated on September 20, 2018, initially as a subsidiary of Decentral. MjLink has a principal place of business located in Colorado.  MjLink was designed to operate as a multinational cannabis technology and media sales organization with two A.I. powered social networks: WeedLife.com and MjLink.com. WeedLife, Inc. ("WeedLife"), part of the MjLink network, is a consumer-to-consumer cannabis social network that was launched in 2013 to expedite the growth of the cannabis industry. Ken Tapp is WeedLife's Chairman and co-founder. MjLink.com is further comprised of individual networks including MJ Invest and Hemptalk. Ken Tapp is MjLink's Chief Executive Officer and co-founder.

4.     Defendant Huntpost.com, Inc. ("HuntPost"), was incorporated in Colorado in or about 2017 and has a principal place of business located in Colorado. It is a division of Outdoorsmen.com, Inc., a licensee of Decentral, and is a social network for the hunting, fishing, and camping community where consumers and industry vendors may sell their goods. Ken Tapp is the Chairman of the Board of Outdoorsmen.com, Inc. and co-founder of HuntPost.

5. Defendant LikeRE.com, Inc. ("LikeRE") is a real estate social networking platform for industry professionals and consumers that was incorporated in Colorado in or about 2016 and has a principal place of business located in Greenwood Villag, Colorado. Ken Tapp is the Co-Chief Executive Officer, Director and co-founder of LikeRE.

6. Defendants MjLink, HuntPost, and LikeRE are all licensees of Decentral (the "Licensees"), which Decentral has an ownership interest in.

7. Defendant Ken Tapp ("Tapp") is a resident of Colorado and is the Chief Executive Officer of Decentral, Chairman and Chief Executive Officer of MjLink, Chairman of WeedLife, Chairman of Outdoorsmen.com, and Co-Chief Executive Officer, Director, and co-founder of LikeRE. Tapp regularly communicated with Plaintiff regarding Decentral and the Licensees via direct emails and telephone calls as well as public podcasts.

8. Defendant Gregory Todd Markey ("Markey") is a resident of Colorado is the President and Board Director of Defendant Decentral and the President of MjLink. He, like Tapp, communicated with Plaintiff regarding Decentral and the Licensees through direct communications and public podcasts.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, and the amount in controversy exceeds $75,000.

3

## NATURE OF THE CASE

10.     This case relates to a serial pattern of misleading, fraudulent, inaccurate, or materially inadequate statements made by Defendants regarding the affairs of two companies, Defendants Decentral and MjLink.

11.     Plaintiff, on the basis of these mistruths, invested over one million dollars in these companies through the purchase of common equity from February 2021 through May 2022.

12.     Among the numerous forums within which Defendants misrepresented the nature of the companies' health and performance was in corporate registration statements and prospectuses, press releases and other public statements, private podcasts only broadcast to equity holders, quarterly and annual filings, press materials, and direct communications with Plaintiff.

13.     Through these fraudulent entreaties, Defendants repeatedly claimed that Defendants Decentral and MjLink had millions of users, were involved in promising M&A transactions, and were highly profitable endeavors. None of these claims were true.

14.     Had Defendants honestly disclosed the true condition of the companies, Plaintiff would have never invested in them. Rather, Defendants misrepresented the financial and business conditions of the companies, inducing Plaintiff to make significant investments in companies that were nothing more than paper tigers.

15. In so doing, Plaintiff was significantly damaged. Plaintiff thus now brings the following action, seeking relief for Defendants' fraud, unjust enrichment, negligent misrepresentations, and breach of fiduciary duty.

## SUBSTANTIVE ALLEGATIONS

16. At the core of this case sits a web of lies and fraudulent misstatements made by Defendants regarding the health and long-term viability of the Corporate Defendants. These statements were made with the intent to induce and maintain investment in the companies and were made by senior company officers and directors. Had Defendants honestly disclosed the condition of their enterprises, Plaintiff would never have invested in the companies nor maintained his investment for the period that he did.

17. Three core groupings of fraudulent misstatements were made by Defendants.

18. *First,* Defendants repeatedly lied about the Licensees' number of monthly active users ("MAUs"), grossly inflating that number to suggest the Corporate Defendants had millions of users. For a social networking site, MAUs are one of the most significant metrics as they represent user counts, which serve as an important indicator of future financial performance (*e.g.*, ad revenue, subscription revenue, etc.). Plaintiff expressly relied on the Director Defendants' MAU counts in deciding to invest in the companies. Yet, those counts were entirely made up and, in

reality, the Licensees' counts were far, far lower than the Director Defendants represented.

19.     *Second*, Defendants repeatedly lied about third-party investor interest in the companies and the companies' business plans. Indeed, Defendants repeatedly suggested that a number of Decentral's Licensees would be involved in M&A transactions and/or would go public through an initial public offering (IPO) or special purpose acquisition company (SPAC), which would lead to a profitable return to investors. None of these statements were true. Rather, these statements were intended to give the impression that the Corporate Defendants were receiving significant interest from third-party investors when, in fact, they were not.

20.     *Third*, Defendants made serial representations regarding the Corporate Defendants' finances and corporate governance, including revenue projections, company valuations, loans, and securities listings. These misrepresentations were similarly designed to instill confidence in Plaintiff regarding the likelihood of the companies' future success, inducing him to make investments he otherwise would not have.

**I.    Defendants Grossly and Fraudulently Inflated the Corporate Defendants' MAUs.**

**A. Plaintiff Purchased Shares in Decentral Based Upon Defendants' Lies about the Licensees' MAUs.**

21.     Decentral's success as a company is intricately tied to the success of the Licensees, as it is the Licensees—not Decentral—that host the networking platforms

that generate users and investors and, in theory, revenue. In that sense, Decentral resembles a holding company with each of the Licensees within its portfolio.

22.    For that reason, the Director Defendants' statements regarding the health of the Licensees were materially critical to investors' understanding of Decentral's health—*i.e.*, if the Licensees were performing well, so was Decentral and vice versa.

23.    In the context of social networking platforms, perhaps no metric is more important than MAUs. Generally, MAUs serve as an important metric for investors because they are used to count the number of unique users who have visited a website or app within a month and are, for example, directly considered by advertisers when determining how much to pay for advertisements. MAUs thus indicate the rate of website or app engagement and serve as one of the main indicators for an online business's overall health and success. For this reason, the importance of MAUs is even greater for social networking companies, where the entirety of their business is reliant upon active online users.  MAUs provide insight into customer retention rate, growth rate, and revenue growth rate. Therefore, an MAU count can be useful in terms of guiding potential investment decisions based upon the perceived value of an online business.

24.    In recognition of the importance of MAUs to investors, the Director Defendants frequently made public statements regarding the Licensees' MAUs. Based on the MAU counts the Director Defendants provided, the Licensees appeared

to have incredibly strong, robust, and active social networks, which—if true—would have promised investors a strong possibility of long-term profit or a significant return through an acquisition.

25.    On that basis, Plaintiff made numerous equity investments in Decentral, relying on the Director Defendants' MAU counts. Of critical importance, MAU counts are not publicly observable or verifiable. Rather, they are proprietary metrics maintained solely by a social network site. Plaintiff was thus wholly reliant on the Director Defendants' stated MAU counts and their honest disclosure of MAU numbers.

26.    And yet, the Director Defendants did not do so. Upon information and belief, Plaintiff understands that while the Director Defendants were offering MAU estimates in the hundreds of thousands and millions, in reality, the Licensees had no more than 25,000 MAUs. Plaintiff has come to this understanding based on internal analysis of the social networks themselves, including analysis of user directories that Plaintiff has discovered on the Licensees' platforms.

27.    The extent of the Director Defendants' misleading behavior regarding MAUs was so extreme that in a June 7, 2021, podcast, the Director Defendants claimed that Decentral was worth $2.1 billion based on the Licensees' MAUs, a proposition that, in light of Plaintiff's actual MAU estimates, now appears wildly inaccurate and absurd.

28.     The Director Defendants have a long history of making material misstatements regarding Licensees' MAUs.

29.     For example, in a February 3, 2021, YouTube podcast, Markey and Tapp claimed that that Licensee LikeRE had 451,019 MAUs as of December 31, 2019, and 924,588 by December 31, 2020. Upon information and belief, LikeRE had no more than a few thousand MAUs at those times.

30.     During the same podcast, Markey and Tapp similarly misrepresented that Licensee HuntPost had 494,190 MAUs by December 31, 2019, and 1,042,755 MAUs as of December 31, 2020.  Upon information and belief, HuntPost had no more than a few thousand MAUs at those times.

31.     The Director Defendants also made materially false and fraudulent statements regarding the projected MAU growth for the Licensees.

32.     For example, on June 16, 2023, Tapp falsely claimed that HuntPost's MAUs had increased nearly 200% from May 2022 to May 2023. Upon information and belief, no such growth occurred.

33.     Similarly, on June 16, 2023, Tapp baselessly projected Outdoorsmen.com would hit a total of 50 million MAUs for the year 2023. Upon information and belief, there was no basis for this projection, and there was no chance Outdoorsmen would ever reach such a high MAU figure.

34.     Tapp and Markey materially misrepresented the Licensees' MAUs and published these grossly exaggerated figures to investors, including Plaintiff.

35. In reliance upon these misrepresentations, Plaintiff purchased 59,949,577 shares of common equity in Decentral in the month of February 2021 for a total of $1,416,029.83. From March 2021 to May 2022, Plaintiff purchased 37,719,612 shares of common stock in Decentral for a total of $332,736.73. In total, Plaintiff purchased 97,669,189 shares of common stock in Decentral for $1,748,766.56.

36. Plaintiff's investment of $1.75 million in the companies was fraudulently procured through the Director Defendants' false statements regarding MAUs. Indeed, rather than these companies being the robust, vibrant social networks Defendants Tapp and Markey claimed, they were nothing more than shell companies through which the Director Defendants established complex corporate structures to enrich themselves.

### B. Plaintiff Purchased Shares in MjLink Based Upon Defendants' Lies about its MAUs.

37. Decentral initially claimed that MjLink was a wholly owned subsidiary of Decentral. Upon information and belief, this is not now, nor has it ever been an accurate description of the relationship between the entities. Nonetheless, for a period of time, MjLink held itself out as a subsidiary of Decentral.

38. Like they did with the Licensees on a February 3, 2021, podcast, Markey and Tapp misrepresented that MjLink had 4,337,379 MAUs on December 31, 2019, and 5,681,966 MAUs as of December 31, 2020. By April 15, 2022, without any

support, Markey and Tapp published that MjLink's MAU count was 8.8 million as of March 31, 2022.

39.     On February 15, 2021, Tapp said in relation to MjLink, "[w]e now have more than 5 million users accessing our networks each month spanning more than 120 countries worldwide. Over the past eight years our network has processed over one billion posts and served up 20 billion page views."

40.     Tapp further misguided Plaintiff by telling him directly that there were millions of active users of WeedLife.com, what Tapp claimed to be the largest user base within MjLink. Meanwhile, on December 1, 2023, upon access and review, WeedLife's social network contained only 7,186 MAUs, with many user profiles fraudulently duplicated (i.e., the same username repeated time and time again) in an obvious effort to inflate the MAU count.

41.     Meanwhile, upon information and belief, formed through investigation of the networking sites and their public user directories, Plaintiff believes MjLink's true MAU count was between several hundred to a few thousand users, nowhere near the nearly 5 million users the Director Defendants claimed.

42.     When Tapp filed MjLink's Form S-1 with the SEC, he provided similarly inaccurate quantitative user metrics and engagement. The SEC requested that Tapp provide all quantitative and qualitative business and industry data he used. Tapp responded to the SEC's inquiry by stating that he mailed the supporting data relative to MjLink's statements regarding online users and the number of users connected via

mobile devices but despite allegedly having "sufficient supporting data," nonetheless decided to delete these statements from the Form S-1 because, as Tapp stated, "they do not effectively promote an understanding of our business."

43.    Tapp and Markey repeatedly misrepresented to shareholders and investors, including Plaintiff, the MAUs of MjLink and its related networking platforms via podcast as well as direct communications.  The Director Defendants went so far as to claim in a June 7, 2021, podcast that MjLink was worth $743 million based on its MAUs.

44.    In reliance upon these misrepresentations, Plaintiff entered into a Class A Common Stock Subscription Agreement for Accredited Investors for the maximum offering of 5,000,000 shares, dated March 9, 2021, which was executed by Tapp on behalf of MjLink.com, Inc.

45.    Plaintiff entered into five more Subscription Agreements dated March 11, 2021, for the sale of 100 shares, 200 shares and 300 shares of common stock issued by MjLink.com, Inc., par value $0.01 per share, again, executed by Tapp.

46.    Plaintiff invested a total of $5,000.00 in MjLink largely based upon Defendants' numerous misrepresentations about its MAUs.

47.    Plaintiff was persuaded to purchase shares in MjLink based largely upon Defendants' unfounded representations about MjLink's MAUs and baseless projections that the company would experience consistent increases in MAUs in the future.

48.     The Director Defendants not only made false statements on investor-only podcasts and to Plaintiff directly but also in publicly filed securities documents. On January 25, 2018, Decentral filed a registration statement with the SEC for an offering of 8,080,001 shares (the "Offering") on Form S-1 (the "Registration Statement") and Prospectus.

49.     The Registration Statement provided that its cannabis and hemp platform would be "[v]iewed by more than 150 million online users across a total of 80+ websites & mobile apps,," that the platform, "[t]hrough Desktop and Laptop users, reaches 53% in Local Searches, and 60% of all mobile users of local searches" and "[r]eaches more than 110 million connected mobile devices across the United States."

50.     None of these statements were even remotely true. Upon and information belief, Decentral had no serious internal projections that its hemp and cannabis platforms would reach 150 million users. Rather, each of the networks had—at most—thousands of MAUs, and even then, most of the "users" on the platforms appeared to be dummy accounts made by management.

## II.     <u>Defendants Repeatedly Lied About Third-Party Investor Interest and Business Plans</u>

### A. **Defendants all but Guaranteed Shareholders that Decentral Would Uplist but Never Did.**

51.     The Director Defendants did not only lie about MAUs, but also third-party investor interest and potential capital markets transactions.

52.     For example, the Director Defendants repeatedly claimed that Decentral would undergo steps necessary to be uplisted from the over the counter (OTC) markets to a major stock exchange. Uplisting occurs when a company upgrades from an alternative stock exchange, such as the OTC, to the NASDAQ or the New York Stock Exchange (NYSE).

53.     Specifically, in or about September 2021, Tapp and Markey announced the plan to uplist Decentral to the NYSE or the NASDAQ.

54.     In or about November 2021, Plaintiff spoke directly with Tapp regarding the possibility of reputational harm if uplisting did not occur. Plaintiff expressed concern about what would happen to the company if Defendants were not as certain as they led on that Decentral would actually enter the NYSE or the NASDAQ and Tapp deceptively told Plaintiff, "we couldn't agree with you more on reputation management and we're confident that won't be an issue."

55.     More so, on May 11, 2022, Tapp issued a press release stating that he would uplist Decentral through a reverse stock split at a minimum of five cents per share. The closing stock price of Decentral on that date was $0.0013. Tapp provided false hope to Plaintiff and numerous other equity holders that, if they held on to their shares, they would become very wealthy once Decentral uplisted at a minimum share price of five cents per share. Tapp went so far as to tell Plaintiff in an email, in April 2022, that Plaintiff could "simply wait until we reach $0.05 again and then sell immediately."

14

56.     Tapp further claimed in a June 3, 2022 podcast, "[w]hen we can reach that five cent per share mark, that is obviously going to be driven from these liquidity events and the capital that comes into the company through our licensing agreement that we have in our tech business incubator that the balance sheet will increase to a point in which it supports a market cap of roughly around $500 million then at that point would put the stock price at five cents or above." Tapp went on to claim that he had an external analyst valuing Decentral at $500 million to provide further credence to his five-cent threshold.

57.     From September 2021 through 2023, Plaintiff listened to Defendants guarantee shareholders both via podcast and direct correspondence that they would uplist Decentral.

58.     Tapp further dismissed concerned investors who questioned the uplisting process by claiming that they were simply not educated on the mechanics and qualification requirements.

59.     In June 2023, Tapp told shareholders and Plaintiff that the five-cent minimum threshold of uplisting was no longer in play. Upon communicating this to shareholders, the share price of the Decentral plummeted. Tapp then went on to say that Decentral's business strategy had changed to include the possibility of acquiring his own companies that participated in Decentral's technology business incubator program. Doing so stood only to harm shareholders while benefiting Tapp.

60.     Ultimately, although Individual Defendants repeatedly guaranteed shareholders from early to mid-2021, that Decentral would uplist, and lied directly to Plaintiff to assuage his concerns about potential harm to the company if its efforts failed, the uplisting that was promised never occurred.

61.     This was because Defendants never actually put in process any of the steps necessary to uplist and, in fact, had no real intention of engaging in an uplisting. Rather, the Director Defendants knew uplisting would be a lucrative basis for investors to either continue to invest or retain their equity in the company, and thus promising it (without any real intention of following through) would effectively maintain investments in their sham companies.

62.     Indeed, the extent of the Director Defendants' grift is most apparent from the fact that Tapp sold all his common shares in Decentral for his own financial gain while promising shareholders that the share price would reach five cents per share based on lies about the Licensees' MAUs, financial condition and business prospects.

## B. Defendants Used the Licensees' Exaggerated MAUs as a Basis for Further Unfounded Projections.

63.     As addressed above, Defendants grossly exaggerated the MAUs of LikeRE, one of Decentral's Licensees, to be over 1 million MAUs when the count was only about 2,000, and even then, most of the "users" on the platform appeared to be dummy accounts made by management.

64.    Defendants lied in publishing to investors that HuntPost, another one of Decentral's Licensees, had over one million MAUs when it really had just over 7,000, most of which also appeared to be dummy accounts made by management.

65.    Based upon these flagrant misrepresentations, from February 2021 to June 2021, Markey and Tapp advised shareholders that a Reg A pre-IPO offering filing was complete and would soon be submitted on behalf of Licensee LikeRE for filing with the SEC. However, this never occurred.

66.    Markey and Tapp similarly misinformed shareholders from February to June 2021 in claiming that a Reg A pre-IPO offering filing was complete and would soon be submitted on behalf of Licensee HuntPost for filing with the SEC. However, this never occurred either.

67.    On an April 15, 2022, podcast, regarding HuntPost's business prospects, Tapp told Plaintiff and shareholders, "[w]e are moving forward to go out and get a $50M-$100M SPAC right away and take HuntPost public right away." However, this never occurred. There was no SPAC or third-party investor interest. Rather, these were just more lies Tapp told to keep investors at bay and to keep his scheme alive.

68.    Moreover, HuntPost published in a press release dated December 31, 2022, "[t]o our surprise, we exceeded our initial goal of finding a dozen great companies that want to be acquired by HuntPost as we aim to conduct an initial public offering" and have "dozens of meetings still ahead of us, we already have 17

trade show operators, representing 60 shows and more than $20 Million in annual revenue."

69.     All of the Director Defendants' statements were lies. The Director Defendants never planned on filing Reg-A pre-IPO statements for either Licensee LikeRE or HuntPost. Nor did Director Defendants have any intention of conducting an IPO or identifying "dozens" of acquisition targets.

70.     Rather, just like their statements regarding uplisting, Defendants knew bringing Licensees public through an IPO would be a lucrative basis for investors to either continue to invest or retain their equity in the company, and thus promising it (without any real intention of following through) would be effective at encouraging and maintaining investment.

### C. MjLink's Offering Circular and Related IPO Discussions Contained Misstatements Designed to Induce the Purchase of Shares.

71.     Just as Tapp and Markey made promises they could not keep about uplisting Decentral, Defendants claimed MjLink had the requisite net proceeds to list its common stock when, in fact, it did not.

72.     On or about February 13, 2020, MjLink filed an Offering Circular on Form 1-A. On September 22, 2020, MjLink's Form 1-A received qualification from the SEC. This offering was qualified for 20,000,000 shares at $2.50 per share up to a maximum offering amount of $50,000,000.

73.     The Offering Circular reflected MjLink's intent to list its common stock on the NASDAQ Capital Market if it realized net proceeds of $4.3 million.

74.    In its comments on MjLink's Offering Statement, dated March 11, 2020, the SEC, Division of Corporate Finance requested further information on MjLink's written intent to list its stock on NASDAQ when it also stated that to do so, pursuant to NASDAQ's requirements, it would have to realize minimum net proceeds of $17.2 million.

75.    On or about March 31, 2020, MjLink issued responses to the SEC's comments and stated, "We have reexamined the aspect of a spinout of MjLink from its parent, Social Life Network, Inc.,[1] as well as a possible listing for MjLink on the NYSE American or NASDAQ, and upon further examination, we have concluded that it is premature to undertake either of those actions. As such, we have eliminated all references and disclosure pertaining to the following: (a) a spinout of MjLink from its parent, Social Life Network, Inc.; (b) filing a Form S-1 Registration Statement in connection with (a); (c) taking MjLink public on the NYSE or NASDAQ or any other exchange or quotation medium."

76.    Tapp and Markey did nothing to clarify the status of the relationship between MjLink and Decentral for shareholders or investors after MjLink's "spinout" from its parent company – particularly after the details of the relationship between the two was further muddied in MjLink's response to the SEC's inquiries on MjLink's Offering Statement.

---

[1] Decentral was formerly known as Social Life Network, Inc.

77. Moreover, even after conceding to the SEC that MjLink was not ready for a public offering on the NYSE or the NASDAQ, Tapp and Markey nonetheless continued to misrepresent to investors and shareholders via investor videos, podcasts, and Twitter posts that they intended to list MjLink on the public market.

78. Tapp and Markey went so far as to baselessly state that MjLink had an additional 500 investors join MjLink's offering, bringing "total investment pledged by non-accredited investors to just over one million dollars" and "over five million dollars pledged by accredited investors and that includes private equity groups and institutional investors." No such investors existed.

79. Tapp and Markey communicated improper and unsupported projections including plans to increase MjLink's share price even though the SEC never qualified any increase.

80. From February through April 2021, MjLink promised shareholders that the price per share would be increased from $2.50 to $5.00 per share. To do so would have required a Reg-A Tier 2 IPO offering. Though Markey told shareholders on March 29, 2021, that MjLink was in the process of having the SEC qualify this increase in "another week or so," the additional offering was never filed. Instead of acknowledging this fact, Tapp encouraged shareholders to "stay tuned," misrepresenting that the second pre-IPO fund round, at $5.00 per share, was "expect[ed] [ ] to be qualified any time now."

81.     The SEC never qualified an increase, but Tapp continued to misinform shareholders that the pre-IPO fundraising was a success, claiming the first round yielded an over subscription of 250%. Tapp covered up delays by advising that the over subscription required additional time for processing investors and completing the amended filing for the second pre-IPO fund round.

82.     Tapp and Markey communicated improper and unsupported projections including the "plan on increasing the share price to $7.50 in the third round and $10 per share for the final round just prior to the IPO."

83.     More than that, Tapp stated that MjLink's initial public offering (IPO) price would be between $12.50 and $15.00 per share with an expectation to sell and convert 55,474,943 shares. When Plaintiff asked Tapp to clarify this valuation, he backtracked, saying that number of shares would not be the accurate and final number before the strike price of the IPO.

**D. MjLink Executed and Withdrew an LOI as Another Ploy for Investments.**

84.     On February 1, 2022, Tapp advised MjLink shareholders via podcast and update posts on MjLink's website that MjLink was moving forward into 2022 with multiple prospects for an M&A deal to be completed. Tapp claimed that MjLink was having discussions with two, potentially, three, separate parties.

85.     More than one year later, on February 23, 2023, Tapp advised MjLink shareholders via podcast and update posts on MjLink's website that MjLink had executed a letter of intent (LOI) to be purchased by a United States based company

21

currently operating in the hemp and cannabis industry. Tapp went on to say that the details of the proposed acquisition would remain private until the acquiring company made a public announcement to their shareholders.

86.     In reliance upon misrepresentations by Tapp regarding MjLink's impending merger and his overinflation of MjLink's MAUs, Plaintiff entered into a Class A Common Stock Subscription Agreement for Accredited Investors for the maximum offering of 5,000,000 shares.

87.     Plaintiff entered into five more Subscription Agreements dated March 11, 2021, for the sale of 100 shares, 200 shares and 300 shares of common stock issued by MjLink.com, Inc., par value $0.01 per share.

88.     Plaintiff invested a total of $5,000.00 in MjLink based upon misrepresentations made by Tapp and Markey, particularly those regarding the potential for M&A deals. On May 29, 2023, MjLink claimed to be withdrawing from the potential purchase detailed in its LOI.

89.     Plaintiff now understands that no such LOI was ever executed or entered into. This was another ploy to attract investors, keep current investors at bay, and continue Defendants' scheme.

III.    **Defendants made Serial Misrepresentations on Finances and Corporate Governance**

90.     In addition to the gross embellishment of MAUs and plans to uplist, Decentral misinformed shareholders, including Plaintiff, that the company had

secured the revenue it needed and eliminated all of its convertible debt to generate over two years of runway capital.

91.     Specifically, in or about February 2021, Decentral issued a press release stating that, "[t]he Company has both secured the revenue needed through existing and new licensees, and eliminated all of its convertible debt, so that we have more than two years of runway capital to continue our growth strategy as a niche industry tech incubator."

92.     Plaintiff has learned that these statements were entirely false, and that—while Decentral claimed it "had" more than two years of runway capital—in reality that number was derived from the company's hope of accruing a fixed percentage of the *unascertained* Licensee revenue that was agreed upon in each Licensee's licensing agreement. Of course, there is a significant difference between *having* two-years' worth of capital versus *hoping* to have the same, and had the Director Defendants' honestly disclosed the latter, Plaintiff would not have invested in the companies.

93.     Tapp also fraudulently communicated via Decentral's private investor network that Decentral had an external analyst report that supported a $500 million valuation. Once again, this was a lie, and no such valuation existed.

## FIRST CLAIM FOR RELIEF
### Fraud or Deceit Based on Misrepresentation
### Against All Defendants

94.    Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

95.    Tapp and Markey made false representations to Plaintiff that induced him to buy shares of stock in Decentral as well as MjLink.

96.    Specifically, Tapp and Markey misrepresented the MAUs of Decentral's Licensees, including MjLink and its independent social networks.

97.    Defendants further misrepresented investor interest by embellishing the Corporate Defendants' business plans. Defendants misrepresented their intention and financial ability to uplist Decentral to the NYSE or the NASDAQ at a specified stock price as well as the likelihood of MjLink entering the public market or being acquired by a large domestic cannabis company.

98.    Defendants misrepresented that they had had secured the revenue necessary to eliminate all of Decentral's convertible debt and generate over two years of runway capital.

99.    The facts Defendants misrepresented were material and Defendants knew that Plaintiff would have regarded the true information as important in deciding to invest in Decentral and MjLink.

100.    At the time the representations were made, Defendants knew the representations were false, or were aware that they did not know whether the representation was true or false.

101.    Defendants made the representations with the intent that Plaintiff would rely on the representations.

102.    Plaintiff did, in fact, rely on Defendants' misrepresentations and Plaintiff's reliance was justified.

103.    Defendants' false representations regarding numerous material facts, and Plaintiff's foreseeable reliance thereon, caused damages and losses to Plaintiff in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Deceit Based on Fraud by Nondisclosure or Concealment
### Against All Defendants

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

105.    In keeping with their ploy to deceive shareholders into investing, Defendants concealed facts related to the past, present and future of the Corporate Defendants, which they had a duty to disclose.

106.    Defendants failed to disclose and/or concealed the true MAUs of Decentral and the Licensees, including MjLink and its independent social networks.

107.    Defendants failed to disclose and/or concealed the Corporate Defendants' financial instability, which created an inability to uplist Decentral or bring MjLink to the public market.

108.    Further, the methodology as well as quantitative and qualitative business and industry data Defendants used in making predictions for future revenue and consumer interest in the Corporate Defendants, and the methodology for Decentral's capital estimation remained a mystery to shareholders as Defendants failed to disclose and/or concealed this information as well.

109.    These facts were material. Defendants knew that Plaintiff would have regarded the undisclosed and concealed information as important in deciding whether to invest in Decentral and MjLink.

110.    Defendants and Plaintiff were in a fiduciary relationship, as discussed below. Nonetheless, Defendants concealed and/or failed to disclose these facts, despite having a duty to disclose them based on the relationship of the parties, with the intent of creating a false impression of the actual facts in Plaintiff's mind.

111.    Defendants stated false facts, but not all material facts, knowing that they would create a false impression in Plaintiff's mind.

112.    Defendants knew that their unclear or deceptive words and conduct would create a false impression of the actual facts in Plaintiff's mind and that Plaintiff was not in a position to discover the facts necessary to guide his investment decisions for himself.

113. Defendants promised to perform an act or communicated an intention to perform an act knowing that the undisclosed facts made their respective performance unlikely.

114. Defendants concealed and failed to disclose the facts with the intent that Plaintiff take a course of action he would be unlikely to take if he knew the actual facts. Plaintiff took such action by making the investments in Decentral and MjLink and in instituting this legal action on the assumption that the concealed and undisclosed facts did not exist or were different from what they actually were.

115. Plaintiff's reliance upon the information provided by Defendants, which included many undisclosed facts, was justified.

116. This reliance caused damages and losses to Plaintiff in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Against Tapp and Markey**

117. Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

118. At all relevant times, Plaintiff was a minority shareholder of Decentral, owning 97,669,189 shares, or 1% of shares.

119. At all relevant times, Plaintiff was a minority shareholder of MjLink, owning 3,500 shares, or 0.07% of shares.

120.    At all relevant times, Defendants Tapp and Markey held positions as officers and directors of Decentral and the Licensees.

121.    As the Chief Executive Officer of Decentral, Chairman and Chief Executive Officer of MjLink, Chairman of WeedLife, Chairman of Outdoorsmen.com, and Co-Chief Executive Officer, Director, and co-founder of LikeRE, Tapp owed the highest degree of loyalty and trust to Plaintiff and was required to exercise good faith and refrain from using his power to harm Plaintiff.

122.    As the President and Board Director of Defendant Decentral and the President of MjLink, Markey owed the highest degree of loyalty and trust to Plaintiff and was required to exercise good faith and refrain from using his power to harm Plaintiff.

123.    Tapp and Markey breached their fiduciary duties to Plaintiff when they fraudulently misrepresented the Licensees' MAUs, Decentral's revenue, convertible debt and runway capital, MjLink's intent and ability to go public, and Defendants' intent and ability to uplist Decentral.

124.    Tapp and Markey breached their fiduciary duties to Plaintiff when they failed to disclose to Plaintiff the true number of MAUs of Decentral and the Licensees, the methodology or business data Defendants used to predict future revenue and consumer interest, Defendants' financial inability to uplist or enter the public market, the methodology for Decentral's capital estimation, and the sources of

Decentral's alleged revenue, including the portion that came from loans provided by Tapp.

125.   As a direct and proximate result of Tapp and Markey's breaches, Plaintiff has suffered damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Civil Conspiracy**
**Against All Defendants**

126.   Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

127.   Defendants acted together in a civil conspiracy. They had a common object to be accomplished, and there was a meeting of minds on this object and course of action.

128.   Together, Defendants sought to induce as many shareholders as possible to invest in the Corporate Defendants by providing pertinent information riddled with material misrepresentations and omissions.

129.   Defendants accomplished this conspiracy and course of action by taking one or more unlawful acts.

130.   Through their numerous fraudulent acts, Defendants schemed to illegally and inappropriately induce Plaintiff to invest in Decentral and MjLink based upon misrepresentations and nondisclosures regarding MAUs, third-party investor interest in the Corporate Defendants, the ability to go public and uplist, the likelihood of MjLink's merger, and Corporate Defendants' revenue and future projections.

131.     Defendants consciously conspired and deliberately pursued a common plan or design that resulted in Plaintiff's purchase of shares in Decentral and MjLink, to financially benefit themselves.

132.     Plaintiff has been damaged as a proximate result of Defendants' conduct in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Against All Defendants**

133.     Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

134.     Defendants have been unjustly enriched, to the detriment of Plaintiff by virtue of their taking and acquisition of Plaintiff's investment monies.

135.     Based upon the factual allegations set forth above, Defendants received benefits under circumstances that would make it unjust for them to retain the benefit without paying Plaintiff.

136.     Plaintiff has been damaged thereby in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
**Negligent Misrepresentation**
**Against All Defendants**

137.     Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

138.    Based on the factual allegations set forth above, Defendants supplied false and misleading information to and concealed information from Plaintiff that induced Plaintiff's purchase of shares in both Decentral and MjLink.

139.    Defendants misrepresented and concealed facts pertaining to their MAUs and investor interest, the likelihood of the Corporate Defendants uplisting, going public, and entering into a merger agreement, along with their revenue, debt, and future projections.

140.    Defendants' misrepresentations and concealments were of material facts.

141.    Defendants failed to exercise reasonable care or competence in communicating these material facts to Plaintiff and Plaintiff justifiably relied on this false and misleading information.

142.    As a result of these acts, Plaintiff has suffered damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
**Misrepresentations and Material Omissions under the Colorado Securities Act**
**Against All Defendants**

143.    Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

144.    Plaintiff invested $1,748,766.56 in Decentral and $5,000.00 in MjLink through his purchase of the collective millions of shares of common stock in the

companies, based upon the misrepresentations and material omissions detailed herein.

145.   Plaintiff's purchase of a total of $1,753,766.56 in shares of stock from Defendants based upon Tapp and Markey's misrepresentations violated C.R.S. §§11-51-501(1) and 11-51-604(3) and (4).

146.   Defendants' violations of C.R.S. §§11-51-501(1) and 11-51-604(3) and (4) were committed recklessly, knowingly, or with an intent to defraud Plaintiff.

147.   Plaintiff relied on Defendants' conduct to Plaintiff's detriment.

148.   As a result of Defendants' violations of C.R.S. §§ 11-51-501(1) and 11-51-604(3) and (4), Plaintiff has been damaged in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Violations of the Colorado Consumer Protection Act
### Against All Defendants

149.   Plaintiff repeats, reiterates, and realleges each and every allegation contained herein with the same force and effect as if hereafter set forth at length.

150.   Plaintiff invested $1,748,766.56 in Decentral and $5,000.00 in MjLink through his purchase of the collective millions of shares of common stock in the companies based upon Defendants' deceptive and unfair trade practices of misrepresenting the Licensees' MAUs, third-party investor interest in the Corporate Defendants, the ability to go public and uplist, the likelihood of MjLink's merger, and Corporate Defendants' revenue and future projections.

151.   Defendants made these misrepresentations to shareholders, including Plaintiff, via investor videos, podcasts, Twitter posts, and direct communication.

152.   Plaintiff's purchase of a total of $1,753,766.56 in shares of stock from Defendants based upon Tapp and Markey's misrepresentations violated C.R.S. § 6-1-105.

153.   Defendants' violations of C.R.S. § 6-1-105 were committed knowingly or recklessly.

154.   Plaintiff relied on Defendants' conduct to Plaintiff's detriment.

155.   As a result of Defendants' violations of C.R.S. § 6-1-105, Plaintiff has been damaged in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief against Defendants jointly and severally:

A. An award of all compensatory and consequential damages, fines, or penalties of whatever nature awardable under applicable statute, rule, regulation, or law, including but not limited to:

   i. All compensatory damages

   ii. All consequential damages

   iii. All actual damages

   iv. All statutory damages

   v. All attorney's fees and costs permitted

33

B.  An award of any other equitable relief;

C.  An award of pre and post judgment interest; and

F.  An award of any further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 8th day of December, 2023.

*s/ Lauren E.M. Thompson*

Lauren E.M. Thompson
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, Suite 600
Denver, Colorado 80209
Telephone: 303-333-9810
Email: lthompson@fostergraham.com
*Attorneys for Plaintiff*

Christa P. McLeod (*admission pending*)
Spiro Harrison & Nelson
363 Bloomfield Avenue, Second Floor
Montclair, New Jersey 07074
Telephone: 973-744-2100
Email: cmcleod@shnlegal.com
*Attorneys for Plaintiff*

Shomik Ghosh (*admission pending*)
Spiro Harrison & Nelson
228 Park Avenue South
New York, NY 10003
Telephone: 646-880-8850
Email: sghosh@shnlegal.com
*Attorneys for Plaintiff*